Charles A. Bowdish was in the employ of the petitioner as chief clerk of its freight auditing department. His duties, as the title of his position indicates, were clerical, and for the most part were performed in the city and county *Page 298 
of San Francisco, where are located the main offices of the company. The company also employed traveling agents, who inspected and corrected the books of local freight agents, and instructed them in the proper keeping thereof. Occasionally Mr. Bowdish was called upon to perform like work. In February, 1914, it appeared that the local agent of the company at Ukiah, a city on one of its lines of railway, was experiencing difficulty in making up his books of account, and Mr. Bowdish was instructed to go to Ukiah, over the railroad of petitioner, and there to aid the local agent in overcoming his bookkeeping difficulties. Mr. Bowdish, in the performance of his duty, left San Francisco in the afternoon of September 14th. In its progress his train arrived at a station known as Asti at about 6:30 P. M. It was dark and raining. As the train was leaving Asti station one Hagemeyer attempted to board it, slipped, fell, and was seriously injured. The train was immediately brought to a stop and aid given to the injured man. In rendering this aid Mr. Hagemeyer was placed upon a stretcher at the scene of his accident, the train was backed down to that point so that the stretcher could be lifted and placed in the baggage-car. This having been done, the conductor and his brakeman shouted the warning signals to the passengers, who had gathered about the scene of the accident, to embark as the train was about to start. The engineer gave the customary signals, the passengers and trainmen boarded the train, and the train got under headway. As it was thus leaving the station for the second time, a brakeman who was standing on the rear platform of the first passenger coach following the baggage-car, prepared to close the vestibule. He heard a noise on the steps below him, and looking down noticed a large, heavy man attempting to jump aboard the moving train. His hands slipped from the side bar, and before the train could be stopped he had fallen between the two cars and was so badly injured that he died almost immediately. This man was Charles A. Bowdish. Application by his widow and minor children was made to the Industrial Accident Commission for an award on account of the death thus sustained. An award was granted and petitioner has sued out this writ of review.
The facts above stated are not in controversy. To justify any award it must be established that the death resulted "from accidental personal injury sustained by the employee, *Page 299 
arising out of and in the course of his employment." Petitioner contends, first, that no word of evidence establishes this fundamental proposition; and, second, that the findings, in so far as they declare to this effect, are wholly unsupported by the evidence. The findings of the commission upon this point are as follows:
"On the day in question the deceased had been ordered by his employer to proceed to Ukiah for the purpose of checking up the accounts at that station, and in pursuance of such order he was riding on a train of the defendant, his transportation for that purpose having been supplied by the defendant. Just as the train left Asti, it ran over and injured a man, and when it stopped, on account of such accident, the deceased alighted from the train, and without orders or request from the conductor or train crew. Upon signal being given by the conductor for the train to proceed, said deceased, after the train had started, attempted to board the same, and in some manner his hold slipped and he fell under the wheels, and was almost instantly killed.
"That the act of said employee in alighting from the train as aforesaid was a natural and reasonable act upon the part of any person traveling upon business of an employer, and was not such a departure from the course of the duties of his employment as to take him outside of the protection given by the Workmen's Compensation, Insurance and Safety Act to employees traveling upon the business of their employment; further that the act of the deceased in alighting from the train, thereby to be available in case his services should be useful, was a portion of his implied duties as an employee of the defendant, and, therefore, that said accident happened while said employee was performing a service growing out of, incidental to, and in the course of his employment.
"That the act of the deceased employee in boarding the train after the same had started, but while still moving at a moderate speed, was not in violation of any orders or instructions of the defendant, and did not constitute more than ordinary negligence."
The determinative findings upon which the award was based, and over which this controversy arises, are those set forth in the two last paragraphs above quoted. It becomes necessary to consider seriatim the statements of fact therein contained. The first of these statements, in so far as it declares that it *Page 300 
was a natural and reasonable act for the deceased to have alighted from the train under the indicated circumstances, calls for little comment. It is quite natural and quite usual for a passenger thus to alight when he knows that a human being has sustained injury, whether the motive which prompts him be one of curiosity, or humanity, or a commingling of the two. The further declaration to the effect that the act of alighting "was not such a departure from the course of the duties of his employment" as to take the employee out of the provisions of the act, is, of course, but a conclusion of law, which will be considered in the discussion to follow. It is sufficient here to point out that the statement seems to imply or admit that his act in alighting was outside of his duties and a departure therefrom. But, singularly enough, this is negatived by the statement immediately following, to the effect (though here again the finding is not direct, but is made by way of implication) that in alighting he was actually performing a duty to his employer, although but an implied duty, and that therefore the "accident happened while said employee was performing a service growing out of or incidental to and in the course of his employment."
The transcript of evidence will be searched in vain to discover one word arising to the dignity of evidence, to establish the statement that the deceased alighted from the train "to be available in case his services should be useful," or that if he did that it was any part of his express or implied duties as an employee of the defendant so to do. The testimony of the president and general manager of the road was taken at great length. That testimony is positive and uncontradicted that there was no rule, written or unwritten, and no custom, whereby employees riding upon a train other than and outside of the train crew were called upon or expected to enter into an investigation in case of an accident, to secure the names of witnesses, or to perform any like service. He says: "Such duties are entirely confined to the conductor of the train, or special agent, or one of his authorized assistants, or one of our railroad policemen who might be on the train. The conductor has authority to call upon any other employee that may be there for assistance, but it is not considered their duty to volunteer, nor is there any obligation on their part so to do. . . . Furthermore, the conductor or special agent or other official whose duties are naturally such matters would consider *Page 301 
it an interference and likely to prove a mix-up." Moreover, in case of an injury such as this, so far from the rules, customs, or desires of the company being that an outside employee should busy himself over the matter, the company objected "to the extent that he might interfere with efficient service that is being rendered by employees whose direct duty it is to do so. . . . Our conductors and trainmen carry in their pockets a card which says to keep the public away and allow two or three men, or one or two men, who can render assistance." This is "ordinarily the train crew." It might be "the engine crew." Asked if it was not a fact that his company considered it "a meritorious effort upon the part of any employee, even an employee who was not a member of the crew, rendering assistance to the crew and to the conductor at the time that an accident happens en route," the record shows the following: "It is entirely a matter of circumstances and conditions. If we had an employee who was standing on the platform and who saw a passenger fall and could reach a hand out and help him, we would expect him to do it." Still further in this connection the witness is asked the following: "I want to ask you if it isn't a fact that if such a thing is done at any time that you consider it a meritorious effort or endeavor on the part of the employee? This refers to any person injured at all. I am referring to an employee who is not a member of the crew and who renders assistance to a person who is injured en route — if you do not consider that a meritorious act on the part of the employee? A. Absolutely." Again asked: "If the conductor and members of the crew are rendering assistance to an injured person and are not in a position to obtain the names of witnesses and facts concerning the accident, wouldn't you expect the employee to render whatever service he could in this particular matter?" the witness answered, "I would expect him to render service to the injured party, not to the company." Repeatedly was the witness subjected to interrogatories dealing with supposititious cases manifestly designed to secure a statement lending color to the proposition that the deceased had alighted from the train in the performance of his duty to render service to the injured man. In every instance the witness denied such to be a part of the employment, making answer in varied form, but always to the following effect: "I would simply say that in so far as the man is concerned, that if he was a *Page 302 
man who was in an entirely different line of service, and traveling as a passenger, that there would be no obligation on him unless called upon." In this case it will be noted that there is no finding either that he was called upon or that he rendered any service, the finding being merely that he alighted so as to be "available in case his services should be useful." It would require a repetition of many pages of this evidence to show the persistency with which the endeavor was made to secure the desired evidence from the witness. But one page of it, as it is a page relied upon by respondent to the writ, in support of the finding may be quoted:
"Q. In a case where a passenger falls off a train or slips off a train and is injured — I am asking you to assume such a case without respect to your opinion concerning this particular case — wouldn't you consider it and do you not consider it, a meritorious service upon the part of any employee of the company upon the train, to render assistance as best he can to the injured party? A. I would think that it would be — I would consider it his duty as a man to render any assistance that he could.
"Q. It is the desire of the company, is it not, to have the injured party treated in the best way possible? A. Absolutely.
"Q. I will ask you, then, if it is not a fact that the company would consider it the duty of the employee where he was in a position to give better aid to the injured party who falls off the train or slips off the train, than the crew is in a position to give such assistance? The company in its desire to give first aid and the best treatment possible to the injured party, to a party falling off the train, considers it a duty of an employee on the train to do whatever he can toward giving that kind of assistance? A. If the man happens to be the nearest to the injured man, as I said, and he can render that assistance more rapidly than any other person on the train, the same as would a passenger or anyone else, it would be his duty as a man to do it.
"Q. If a passenger and an employee of the company were in a like position concerning the matter, wouldn't you consider it more incumbent upon your employee to do it than you would the passenger? A. I would consider it more incumbent, yes."
Another witness was Mr. Love, a traveling auditor of the company. Like interrogatories were put to him. The answers were the same in substance as those given by Mr. Palmer, the *Page 303 
president of the company. Thus, he is asked: 'You know, do you not, that the company, the Northwestern Pacific Railroad Company, and every other company, wants its employees to act in a humane manner after an accident happens? A. Yes, sir. I should naturally expect that. . . . It would be quite natural for anybody to offer their services to the conductor. If I was on a train probably I would offer my services for the relief of the injured only if humane impulse prompted me — prompted by humane impulse only.
"Q. Suppose you were on a train at Asti station. Suppose the train started up and a passenger getting on the train is injured, and you are in a position to give them aid, irrespective of whether the conductor is also in a position to give that party aid. I would ask you if you would not, under the circumstances, leave your seat in the train and get off and administer what aid you could to the injured party? A. Yes."
And again: "Q. In fact, you know, do you not, that the company employee is expected to render what assistance he can in the matter, and this rule or these rules, and all other regulations of the company that you know of are dictated for the purpose of giving better aid to the injured party? A. That is right."
Here in fullness has been set forth all the evidence quoted in respondent's brief as supporting this finding. Even as detached from its context it shows no conflict whatsoever with the direct and positive statements of these witnesses touching the duties of such an employee, and read with the context it leaves not even the shadowiest ground for argument that the witnesses meant other than to declare what a man, actuated by the impulse of humanity — a passenger as well as an outside employee — might do under the supposititious conditions presented by the questions.
The utmost that was elicited was that it would have been the duty of the deceased to have assisted if his services had been requisitioned by the conductor in charge of the train. It is not contended that the deceased was requested to help. To the contrary, the direct and positive testimony of the conductor and train crew is that they themselves, and they themselves alone, without asking assistance of any, promptly and efficiently rendered aid to the injured man. And in thus stating that there is no conflict in the evidence, the testimony of Hoyle, a passenger upon the train, has not been overlooked. *Page 304 
Hoyle does not testify, as respondent states, that "neither the conductor nor any other member of the crew took part in the relief work," and that "Mr. Bowdish took charge of the situation." Mr. Hoyle's testimony is this: Upon the occasion of the last stopping of the train which preceded the accident to the deceased, Hoyle's wife, who was a passenger with him upon the train, looked out of the car window, saw that someone had been injured, and said that she believed it was Hagemeyer. "Of course he is the man whom my wife and I both have known for twenty years. I said, 'I will look and see.' " He took for his post of observation a platform of the car and stood there after the vestibule had been opened and others had debarked. He "had a fair view of the body lying on the ground and saw it was Hagemeyer. The conductor and the brakeman were on the ground. It was, I should judge, perhaps, roughly estimating, fifteen or twenty-five minutes before anything apparently was done, any more than people simply standing around, watching the man lying on the ground. In the meantime there was someone, I don't know who he was, a rather chunky built man, seemed to be taking an interest in what was going on, and apparently endeavoring to direct the movements of different ones. He was in civilian's clothes. He, as I recall it, made the suggestion that they better get a cot to put this man Hagemeyer on, and soon a cot was brought, I suppose from the baggage-car, and the body was lifted on to the cot, and then the train was backed up, and of course when the train backed up he passed out of sight." The witness did not know Mr. Bowdish. "The color of his clothes [of the man last injured, who was Bowdish] as near as I could say was practically the same [as those worn by the man who, as he recalled it, made the suggestion that they better get the cot]; in fact, it struck me when I went back to the rear of the train after Bowdish had been run over, that it was the same man whom I had seen directing the movements, although I could not say that it was." Furthermore, testifies the witness, "I would not state positively he was the same person. He was apparently dressed in the same clothes and about the same size." This, we repeat, does not rise to the dignity of evidence, and that without regard to the fact that he "roughly estimates" the time as from fifteen to twenty-five minutes after the train stopped before it started again, while all of the trainmen, whose duty it was *Page 305 
to note this time, placed the total lapse as between three minutes and five, and without regard to the additional fact that they performed their duties of obtaining a stretcher, placing the man upon it, backing the train up and putting the man in the baggage-car, without suggestion from any other person, and without invoking the aid of any other person. Finally, it is notable in this connection that the findings of the commission, which are made as favorable as possible in support of the award, are silent upon the matter of Hoyle's testimony that Bowdish took charge or gave directions, or did any single act in aid of the injured man, the sole finding in this regard being put in the form of a fact, inferentially stated, that Bowdish alighted from the train "to be available in case his service should be useful."
But in addition to this, and accepting this statement as a supported finding of fact, and with it the further statement that his action in alighting from the train "was a portion of his implied duties as an employee," there remains a consideration equally determinative against the validity of this award. The findings proceed to say that because he alighted in the performance of an implied duty, "therefore that said accident happened while the said employee was performing services growing out of, incidental to, and in the course of his employment." This, of course, is but a conclusion. Up to this point the findings have not declared upon the exact act which Bowdish was performing when he met his death — the act of endeavoring to climb on board a moving train. That is covered by the next declaration: That the act of the deceased "in boarding the train after the same had started, but while still moving at a moderate speed, . . . did not constitute more than ordinary negligence. . . . And said employee was not intoxicated at the time of said accident, and therefore that said accident was not caused by the willful misconduct or intoxication of such employee." Heretofore in our decisions it has been frequently pointed out that the language of our law justifying an award only when an employee is performing services "growing out of, and in the course of his employment" is taken from the earlier English act upon the same subject, and under familiar principles was adopted with the construction which the courts of that country had put upon that language. A consideration of the English adjudications will show, first, that upon principle it *Page 306 
cannot be said that the accident here occurred while the deceased was performing service either growing out of or incidental to or in the course of his employment. Furthermore, a reading of those cases will disclose that not only upon principle, but upon adjudications presenting the precise question of an employee boarding a moving car under circumstances such as this, it has been uniformly held that injuries thus sustained are not within the purview of the law. Some of these cases have heretofore been considered inOcean Accident Guarantee Co. v. Industrial AccidentCommission, 173 Cal. 313, [159 P. 1041]. Others to the same effect are Anderson v. Fife Coal Co. [1909], S.C. 8, 47, Scott. L. R. 3, 3 B. W. C. C. 539; Fletcher v. The Duchess [1911], App. Cas. 671, 81 L. J. K. B., N. S., 33; 55 Sol. J. 598, 4 B. W. C. C. 317, 105 L. T., N. S., 121; Losh v. Evans,
51 Week. Rep. 243, 18 Times L. R. 142; Hendry v. Caledonian Ry.Co. [1907], S.C. 732. The proposition is as stated in 1 Dresser on Employers' Liability, section 104: "When a servant of his own accord and without the direction of his master steps outside the scope of his employment, whether on the master's business or his own, the master owes him no duty as to the dangers he encounters and is not liable for any injury received." And the particular principle clearly applicable to the case at bar is that an employee, even when in the performance of his duty, may not impose upon his employer any greater risk and responsibility than that inhering in the character of the duty itself. Thus to illustrate: An employee engaged in and about machinery, where a part of his duty is to keep that machinery clean and in running order, while in the performance of that duty may carelessly become entangled in moving cogs, and recover. A traveling man, using a railway train with ordinary precautions and injured by a collision would be granted a recovery. But if that same traveling man, seeking to catch a train to go to another station, still under his employment, should attempt to board a moving train, this being no part of his instructions and no part of his duty, he has added to his vocation perils not contemplated in the contract of employment, and for injuries sustained by him by reason of this added risk the employer is not liable. Such is the case of Wemyss Coal Co. v. Symon, 49 Scott. L. R. 921, 6 B. W. C. C. 298, where a messenger-boy, given money to buy his ticket to travel to a certain *Page 307 
destination, undertook to board a slowly moving tram-car and was injured. It is said: "No question of serious or willful misconduct arises in the case. The sole question in the case is whether the accident arose out of and in the course of the respondent's employment." It was held that no order and that no orderly performance of his duty compelled him to take the risk of mounting the moving car, and that in doing so he was "willfully taking an outside risk not incident to the reasonable requirements of duty." Such also is the case ofJibb v. Chadwick, 8 B. W. C. C. 152, where a workman's regular course of employment compelled him to travel on trains. He was furnished by his employer with a season ticket, enabling him so to do. He was expected to return to Rotherham and report at his employer's office at 6 P. M. each day. Arriving at the station at Sheffield he attempted to board a train while in motion, this train being the last train which would bring him to his place of service on time. He fell and suffered injury, and the unanimous holding was that in attempting to enter the train while in motion "the workman exposed himself to an additional risk by doing an unauthorized and illegal act, which was not in any way incidental to his employment, and that therefore the accident did not arise out of and in the course of his employment."
For these reasons it follows that the award must be annulled, and it is adjudged accordingly.
Melvin, J., Lorigan, J., Sloss, J., Lawlor, J., Shaw, J., and Angellotti, C. J., concurred.
Rehearing denied. In denying a rehearing the following opinion was rendered on February 26, 1917:
The judgment annulling the award is sufficiently supported by what is said in the opinion on the question first discussed, viz., whether or not the deceased was acting in the course of his employment in alighting from the train or at any time thereafter. The conclusion that in alighting from the train and in what occurred thereafter, the deceased was not performing a service growing out of, incidental to, or in the course of his employment disposes of the case, and renders unnecessary the decision on the further question discussed, viz., whether, assuming that the deceased was in alighting from the train and in what he did thereafter acting *Page 308 
in the scope of his employment, he did not step without such scope when he attempted to board the train while it was moving, with the result that solely because of such attempt, the consequent accident did not arise out of or in the course of his employment. Upon that one question we are not entirely satisfied as to the correctness of the views expressed in the opinion, and, without expressing any contrary view, we prefer to leave the question undecided in this case, by withdrawing, as we do, our assent to the portion of the opinion dealing therewith.
Shaw, J., Lawlor, J., Sloss, J., Angellotti, C. J.